UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------

RICHARD J. HUTTER, JR.,

                Plaintiff,

-against-

The CITY OF NEW YORK, STEPHEN CIRABISI, as Inspector, Chief of Department Investigation Review Section, Vehicle Identification Unit and LEONTYNE GARNER, as Sergeant, Chief of Department Investigation Review Section, Vehicle Identification Unit, each sued individually and in their official capacities as employees of Defendant CITY OF NEW YORK,

                Defendants.
--------------------------------------------------------

**MEMORANDUM & ORDER
18-CV-6421 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Richard J. Hutter, Jr., a former New York City police officer, brings this action against Defendants the City of New York, Inspector Stephen Cirabisi, and Sergeant Leontyne Garner (Compl. (Dkt. 1).) Plaintiff asserts that Defendants retaliated against him in violation of his First Amendment rights. Before the court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Not. of Mot. to Dismiss (Dkt. 16).) For the reasons set forth below, the motion is GRANTED.

1

## I. BACKGROUND

### A. Factual Allegations

The court takes the following statement of facts from Plaintiff's complaint, the well-pleaded allegations of which the court accepts as true for the purposes of a motion to dismiss. *See N.Y. Pet Welfare Ass'n. v. City of New York* 850 F.3d 79, 86 (2d.Cir. 2017).[1]

Plaintiff is a former Lieutenant in the New York City Police Department ("NYPD"). (Compl. ¶ 8.) Plaintiff alleges that in or around February 2016, while assigned to the School Safety Uniform Task Force, Defendant Cirabisi requested that Plaintiff transfer to the Chief of Department Investigation Review Section, Vehicle Identification Unit (the "VIU"). (*Id.* ¶ 9.) Plaintiff alleges that Cirabisi expressed his unhappiness with the efficiency of operations in the VIU, including the supervision of personnel within the unit. (*Id.* ¶ 10.) In particular, Cirabisi voiced concern about Detective Donald Hoehl, the nephew of Retired Assistant Chief Allan Hoehl. (*Id.* ¶¶ 11-12.) Cirabisi allegedly told Plaintiff that Cirabisi had "received numerous complaints" about Hoehl's "unprofessional and abusive behavior towards other employees" and that Hoehl was "failing to perform his assigned duties." (*Id.* ¶¶ 13-14.) Plaintiff alleges Cirabisi was afraid to discipline or transfer Hoehl, despite Cirabisi's concerns, because he was "afraid of Hoehl's connections." (*Id.* ¶ 15.) Two weeks after he was assigned to the VIU, Plaintiff met with Hoehl to discuss Plaintiff's expectations for him. (*Id.* ¶ 16.) Plaintiff also met with Hoehl's direct supervisor, Defendant Garner, and instructed Garner to closely monitor Hoehl. (*Id.* ¶¶ 17-18.) Plaintiff alleges that despite these discussions there was "little improvement" in Hoehl's performance over the ensuing weeks. (*Id.* ¶ 19.)

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted and all omissions and alterations are adopted.

In or around April 2016, Plaintiff issued Hoehl a "Command Discipline" for failing to properly carry out his duties. (*Id.* ¶ 20.) Soon thereafter, Plaintiff met with Cirabisi and Garner and requested that Hoehl be transferred out of the unit due to his continued poor performance. (*Id.* ¶ 21.) Cirabisi denied Plaintiff's request. (*Id.* ¶ 22.)

At a meeting in July 2016, Plaintiff alleges that he learned that Hoehl's "unprofessional and abusive behavior towards other employees and poor performance" was related to Hoehl's alcohol abuse. (*Id.* ¶ 23.) Cirabisi and Garner told Plaintiff that Hoehl consumed alcohol while on duty. (*Id.* ¶¶ 23-24.) Plaintiff "express[ed] his shock and displeasure" that Defendants "would cover-up Detective Hoehl's alcohol abuse." (*Id.* ¶ 25.) Plaintiff alleges that Cirabisi and Garner then ordered Hoehl to report to the Medical Division. (*Id.* ¶ 26.) Hoehl was then "placed on Restricted Duty status and assigned to the Counseling Services Unit." (*Id.* ¶ 27.) Hoehl's conduct was not, however, reported to the Internal Affairs Bureau, nor was he suspended. (*Id.* ¶ 26.) Shortly thereafter, Plaintiff looked through the papers on top of Hoehl's desk looking for incomplete work. (*Id.* ¶ 28.) Garner observed Plaintiff doing this and questioned why Plaintiff needed to search through Hoehl's desk. (*Id.* ¶ 29.)

In or around September of 2016, Plaintiff learned that he was the subject of a false complaint that he called Hoehl "Donna." (*Id.* ¶¶ 30-31.) He was ordered to appear before the Office of Equal Employment Opportunity, which determined that the allegation was "unsubstantiated." (*Id.* ¶¶ 31-32.) Plaintiff alleges he was the subject of another "false allegation" in December 2016, when he was ordered to appear at the Internal Affairs Bureau regarding an accusation that he was "stealing time." (*Id.* ¶¶ 35-36). Plaintiff had previously been told by Cirabisi that Plaintiff was no longer eligible to accrue overtime hours. (*Id.* ¶ 34). Plaintiff again appeared before the Internal Affairs Bureau in February 2017, regarding

the allegations of "stealing time" and "failing to supervise." (*Id.* ¶¶ 37-38.)

On or about March 8, 2017, Cirabisi "administratively transferred" Plaintiff to the 106th Precinct "pending receipt of Charges and Specifications." (*Id.* ¶ 39.) Ultimately, in late June 2017, Plaintiff appeared before the Internal Affairs Bureau regarding an allegation of "improper use of department computers." (*Id.* ¶¶ 40-41.) "[F]aced with mounting false allegations and pending receipt of Charges and Specifications," Plaintiff retired from the NYPD on January 31, 2018. (*Id.* ¶ 42.)

### B. Procedural History

Plaintiff filed his complaint on November 12, 2018. (Compl. (Dkt. 1).) In his complaint, Plaintiff brings a claim pursuant to 42 U.S.C. § 1983 for retaliation under the First Amendment. (*Id.* ¶¶ 44-47). On March 28, 2019, Defendants submitted a fully briefed motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs. Mem. in Supp. of Mot. to Dismiss ("Mem") (Dkt. 17); Pl. Mem. in Opp. to Defs. Mot. to Dismiss ("Opp.") (Dkt. 18); Defs. Reply Mem. in Supp. of Mot. to Dismiss ("Reply") (Dkt. 19).) Defendants argue that Plaintiff's complaint should be dismissed because Plaintiff's alleged speech is not protected by the First Amendment, Plaintiff fails to adequately plead a claim under *Monell*, and that the Defendants are protected by Qualified Immunity. (*See* Mem. at 4-15.)

## II. LEGAL STANDARD

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In reviewing a complaint, the court must accept as true all allegations of fact, and draw all reasonable inferences from these allegations in favor of the plaintiff. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[M]ere 'labels and conclusions' or 'formulaic recitations of the elements of a cause of action will not do'; rather, the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting *Twombly*, 550 U.S. at 555).

### III. DISCUSSION

#### A. First Amendment Retaliation Claim Against Individual Defendants

Plaintiff alleges that Defendants violated his First Amendment rights by retaliating against him—causing him "mental anguish, damage to his personal and professional reputation, and loss of employment opportunities"—when he refused to "condone and cover-up Detective Hoehl's alcohol abuse." (*See* Compl. ¶¶ 44-47.) To state a First Amendment retaliation claim, Plaintiff "must plausibly allege that (1) his . . . speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him . . .; and (3) there was a causal connection between this adverse action and the protected speech." *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). Because Plaintiff's speech is not protected by the First Amendment, the court grants Defendants' motion to dismiss.

1. Protected Speech

For a public employee's speech to be protected by the First Amendment, the employee must be speaking as a citizen on a matter of public concern, rather than speaking pursuant to his official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006). If the employee "either did not speak as a citizen or did not speak on a matter of public concern," the speech is not protected. *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009).

The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: "(1) whether the speech falls outside of the employee's official responsibilities, and (2) whether a civilian analogue exists.'" *Montero*, 890 F.3d at 397 (quoting *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015)). While the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive; the first inquiry is the critical one. *Id.* at 397-98. What matters is not whether the speech was *related* to the employee's official duties, but rather whether it was *pursuant* to her official duties; if it was, the employee was speaking as an employee, not a citizen. *See Id.* at 398 ("[T]he question . . . is whether the employee's speech was part-and-parcel of that person's concerns about his ability to properly execute his duties.").

Here, Plaintiff's spoke pursuant to his official duties as an NYPD Lieutenant. As Plaintiff notes, Cirabisi assigned Plaintiff to the VIU in part because Cirabisi "had a concern about Detective Hoehl." (Compl. ¶ 11.) Plaintiff's subsequent meetings with Cirabisi and Garner to discuss Hoehl were thus manifestly part of what Plaintiff "was employed to do." *Garcetti*, 547 U.S. at 424. When Plaintiff expressed "shock and displeasure" to Cirabisi and Garner about their handling of Hoehl's alleged alcohol abuse, Plaintiff's speech was "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203.

Plaintiff argues that the Second Circuit's decision in *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), compels a different outcome because Plaintiff's speech "addressed [D]efendant[s]. . . covering up and forcing [Plaintiff] and other employees to work with an unfit officer due to alcohol consumption while on-duty." (Opp. at 8.) Plaintiff further argues that, like the plaintiff in *Matthews*, he spoke as a citizen because "his actual, functional job responsibilities did not include reporting his personal opinions" about the way the Defendants "intentionally cover[ed] up and forc[ed] [Plaintiff] and other employees to work with" Hoehl. (*Id.*)

Plaintiff's arguments miss the mark. In *Matthews*, the Second Circuit held that a police officer was speaking as a citizen when he alerted the commanding officer of his Precinct that "supervisors in the Precinct [had] implemented a quota system mandating the number of arrests, summons, and stop-and-frisks that police officers must conduct." 779 F.3d at 169. In reaching this conclusion, the court emphasized that the plaintiff "ha[d] no duty to monitor the conduct of his. . . supervisors," that "policy-oriented speech was neither part of [plaintiff's] job description nor part of the practical reality of his everyday work," and that plaintiff "was not flagging specific violations of law, but rather expressing an opinion on a policy." *Id.* at 171, 174, 175. Here, by contrast, there is no doubt that Plaintiff had a duty to monitor Hoehl, his subordinate officer; in fact, that is one of the reasons he was transferred to the new unit. Furthermore, Plaintiff's expression of "shock and displeasure" as to how Defendants decided to handle Hoehl's alcohol abuse was not "policy-oriented speech" akin to the speech in *Matthews* alerting NYPD executives to a precinct-wide policy of stop-and-frisk, but constituted a disagreement regarding the proper management of one VIU officer. *See Matthews*, 779 F.3d at 175.

7

Other factors courts analyze to determine whether an employee was speaking pursuant to his official duties also do not help Plaintiff. For example, Plaintiff's speech "resulted from knowledge which he acquired through the performance of his duties" as an NYPD officer. *Airday v. City of New York*, 131 F. Supp. 3d 174, 180 (S.D.N.Y. 2015). In addition, while the court is cognizant that "formal job descriptions often bear little resemblance to the duties an employee is expected to perform," *Garcetti*, 547 U.S. at 421, the court finds it relevant that the NYPD Patrol Guide has a regulation directly applicable to this case, namely that "[a] ranking officer who reasonably believes that a uniformed member of the service is unfit for duty due to effects of an alcoholic intoxicant will notify the precinct commander/duty captain." (Mem. at 6.) That is exactly what Plaintiff did in this case. (*See* Compl. ¶¶ 23-25.) To be sure, "exposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler*, 658 F.3d at 236. Here, though, the complaint does not allege speech seeking to expose official misconduct, but speech made to voice disagreement with superior officers about a management decision. That the complaint uses the conclusory phrase "cover-up" does not—on its own and without further alleged facts—transform Plaintiff from an employee to a citizen for the purposes of his First Amendment claim.

Finally, the lack of a civilian analogue bolsters the court's conclusion that Plaintiff did not speak as a citizen. Speech has a "relevant civilian analogue if it is made through channels available to citizens generally." *Matthews*, 779 F.3d at 175 (quoting *Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011)). For example, in *Matthews*, the Second Circuit emphasized that plaintiff complained about the quota system to various officials "with whom he did not have regular interactions." *Id.* at 176. Here, by contrast, Plaintiff directed his speech to fellow officers with whom

he regularly spoke, including Cirabisi, who was Plaintiff's superior officer and the officer to whom Plaintiff was required to report regarding his oversight of Hoehl. Nor was Plaintiff's speech made "to an independent state agency responsible for entertaining complains by any citizen in a democratic society regardless of his status as a public employee," *id.* at 175, or an example of "prototypical protected speech by public employees, [such as] making a public statement, discussing politics with a coworker, writing a letter to newspapers or legislators, or otherwise speaking as a citizen." *Brady v. Cty of Suffolk*, 657 F. Supp. 2d 331, 343 (E.D.N.Y. 2009).

In sum, "taken together, all of these . . . facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a 'contribution to the civic discourse.'" *Frisenda v. Inc. Vill. of Malverne,* 775 F. Supp. 2d 486, 507 (E.D.N.Y. 2011) (quoting *Garcetti*, 547 U.S. at 422). Accordingly, the court grants Defendants' motion to dismiss.

### B. First Amendment Retaliation Claim Against the City of New York

A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 under a theory of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). To the contrary, a municipality may only be held liable for the constitutional violations of its employees when such violations result from the municipality's official policy. *Id.* at 693. Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), or (3) a decision by a person with "final policymaking authority," *id*. at 123; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).

However, "*Monell* does not provide a separate cause of action for the failure by the government to train[, supervise, or discipline] its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Accordingly, as the court has dismissed Plaintiff's underlying § 1983 claim, it need not reach the question of whether Plaintiff has adequately pleaded a *Monell* claim. *See id.* ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Johnson v. City of New York*, 551 F. App'x 14, 15 (2d Cir. 2014) (summary order) ("Because [plaintiff] has not alleged a valid underlying constitutional deprivation, his claim against New York City pursuant to *Monell* . . . must also fail." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Accordingly, Plaintiff's retaliation claim against the City must be dismissed.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 16) is GRANTED. The Clerk of the Court is respectfully DIRECTED to close the case.

SO ORDERED.

Dated:   Brooklyn, New York
         March 23, 2020

                                            /s/ Nicholas G. Garaufis
                                            ―――――――――――――――
                                            NICHOLAS G. GARAUFIS
                                            United States District Judge